# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* Jaci Glass, <br>                     Plaintiffs, <br><br> v. <br><br> NEUROPSYCHIATRIC HOSPITAL OF INDIANAPOLIS LLC, <br> VANGUARD ELDERCARE LLC, <br> Steven Posar, Cameron Gilbert, <br><br>                     Defendants. | FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) AND LOCAL RULE 5-11 <br><br> CIVIL ACTION NO. _____ <br><br> 1:16-cv-0560 TWP MPB <br><br> JURY TRIAL DEMANDED |

---

## FALSE CLAIMS ACT COMPLAINT

---

### FILED UNDER SEAL

### PURSUANT TO 31 U.S.C. §§ 3729 *et seq.*

Bruce C. Howard
*bhoward@siprut.com*
Richard S. Wilson
*rwilson@siprut.com*
**SIPRUT PC**
17 North State Street
Suite 1600
Chicago, Illinois 60602
312.236.0000
Fax: 312.267.1906

Attorneys for Plaintiff-Relator
Jaci Glass

## COMPLAINT

Plaintiff Jaci Glass ("Glass" or "Relator"), by and through the undersigned attorneys, on behalf of the United States of America, complains of the above named defendants and each of them as follows:

## STATEMENT OF THE CASE

1. Relator's claims are based on Defendants' submission of false and fraudulent claims to the United States in order to obtain reimbursement from Medicare for holding patients longer than is medically necessary pursuant to a 14-day patient holding policy at the NeuroPsychiatric Hospital of Indianapolis ("NPHI"), as follows:

   A. NPHI receives reimbursement from Medicare through its provision of inpatient psychiatric hospital services. Patients at an inpatient psychiatric hospital should remain inpatient until they are without symptoms and stable on their current treatment regimen for approximately two to three days. In order to increase reimbursement payments from Medicare, Defendants enacted a policy to hold patients for at least 14 days, regardless of the patient's medical needs.

   B. In violation of Medicare guidelines, Defendants certified that the services provided to NPHI patients were reasonably expected to improve patients' condition and were medically necessary, when in fact Defendants were holding NPHI patients solely to increase per-diem reimbursement payments.

2.   The Relator, Jaci Glass, seeks to recover on behalf of the United States treble damages and civil penalties arising from false claims, and the creation of false records and statements made or caused to be made and submitted directly or indirectly by the defendants, to the United States Government, all in violation of the False Claims Act, 31 U.S.C. §§ 3729 – 32.

## JURISDICTION AND VENUE

3.   The Court has jurisdiction over the subject matter of the False Claims Act claims pursuant to 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought pursuant to §§ 3729 and 3730 of Title 31; pursuant to 28 U.S.C. § 1331, which confers federal subject matter jurisdiction for federal questions; and pursuant to 28 U.S.C. § 1345, which confers federal subject matter jurisdiction over actions where the United States is plaintiff.

4.   Contemporaneous with the filing of this Complaint, Glass provided the Attorney General of the United States a statement of material evidence and information regarding the allegations herein of which Glass is aware, together with a copy of the Complaint, in accordance with the provisions of 31 U.S.C. § 3730(b)(2).

5.   This Court has personal jurisdiction over each defendant herein pursuant to 31 U.S.C. § 3732(a) because each submitted, or caused to be submitted, false claims directly or indirectly to the Government; and because each has made, used, or submitted, or caused to be made, used, or submitted false or fraudulent records in this District to get false claims paid or approved.

Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §§ 1391(b) and 1391(c) because each defendant can be found and transacts business that is the subject matter of this lawsuit in the Southern District of Indiana.

6. This suit is not based upon the public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, and to the extent that some allegations or transactions alleged herein have been publicly disclosed, Glass is an "original source" of the same within the meaning of the False Claims Act, 31 U.S.C. § 3730(e)(4)(A), and voluntarily disclosed such information to the government before filing this action. Glass gained direct and independent knowledge of the frauds alleged herein through her observations while an employee at NPHI.

## PARTIES

### The Plaintiff-Relator

7. This action is brought by Relator Jaci Glass on her own behalf and on behalf of the United States of America.

8. Relator Glass is a citizen of Indiana. Glass was a nurse practitioner at NPHI from July 2015 through January 2016, during which time she was involved in the treatment and discharge planning process for psychiatric hospital patients. For the entire time she was at the Hospital, Glass was an employee of Vanguard Eldercare LLC.

**The Defendants**

9. Defendant NPHI at all relevant times has been registered with the State of Indiana as a Domestic Limited Liability Company.

10. NPHI has offices and facilities located at 6720 Parkdale Place, Indianapolis, Indiana 46254, and at all relevant times has provided an array of services, on site, for the treatment of inpatient psychiatric hospital patients.

11. There are several other inpatient psychiatric hospitals in Indiana operating under the auspice of NeuroPsychiatric Hospitals, including: (a) Doctors NeuroPsychiatric Hospital, located in Bremen, Indiana; (b) Rivercrest Specialty Hospital, located in Mishawaka, Indiana; and (c) NeuroPsychiatric Hospital of Northwest Indiana/Chicago, which is currently under development and scheduled to open in Spring 2016.

12. Defendant Vanguard Eldercare LLC ("Vanguard") at all relevant times has been registered with the State of Indiana as a Domestic Limited Liability Company. Vanguard is the employer of clinical professionals at NPHI.

13. Defendant Cameron Gilbert, Ph.d ("Gilbert") at all relevant times was the owner, President and CEO of NPHI.

14. Defendant Steven Posar, MD ("Posar") is licensed to practice medicine by the State of Indiana, and at all relevant times was the CEO of Vanguard.

15. Defendants Posar and Gilbert (the "Individual Defendants") were agents of Vanguard and NPHI, and were acting within the scope of their agency

relationship with Vanguard and NPHI while providing inpatient psychiatric hospital services to beneficiaries under the Medicare program.

## LEGAL AND REGULATORY BACKGROUND

### A. The False Claims Act

16. Congress enacted the False Claims Act which provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000] plus three times the amount of damages which the Government sustains....
>
> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

17. False certifications constitute false claims under the False Claims Act, as do billing for services that are not "reasonable and necessary for the diagnosis and treatment of illness or injury" or for non-reimbursable services.

### B. The Medicare Program

18. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. See 42 U.S.C. §§ 1395 *et seq.* The Medicare Program is a federal health insurance program for older Americans and persons with disabilities. Individuals

who are insured by Medicare are known as beneficiaries. Medicare is funded by the federal government and administered by the federal Centers for Medicare and Medicaid Services ("CMS"), which is a division of the U.S. Department of Health and Human Services ("HHS").

19.     The Medicare program is comprised of several parts. Health care services and payment under Part A of the Medicare program are the subjects of this case. Part A of Medicare is a federally subsidized, voluntary insurance program that covers inpatient hospital services for a statutory period of days. 42 U.S.C. § 1395d.

20.     Under the Medicare Program, CMS makes payments to health care providers for inpatient services after the services are rendered. Medicare enters into provider agreements with health care providers and physicians that govern the health care provider's participation in the program. Under Medicare, reimbursement for inpatient psychiatric hospital services may be made only if: (a) a physician certifies that the services are or were reasonably expected to improve the condition for which such services were provided; (b) a physician certifies that inpatient diagnostic study is or was medically required, and such services are or were necessary for the purpose of diagnostic study; and (c) the services are those which the records of the hospital indicate were furnished to an individual during periods when the individual was receiving (i) intensive treatment services, (ii) admission and related services necessary for a diagnostic study, or (iii) equivalent services. 42 U.S.C. §§ 1395f(a)(2)(A); 1395f(a)(4).

21.     Medicare reimburses health care providers for the costs of providing covered health services to Medicare beneficiaries. See 42 U.S.C. §§ 1395f(b)(l), 1395x(v)(l)(A). Health care providers rendering services to Medicare beneficiaries seek reimbursement by submitting a claim form to the Medicare carrier. This claim form, called a CMS Form 1500, is a "Request for Medicare Payment" which describes, among other things, the services provided to the patient, the symptoms or diseases suffered by the patient, and identifies the medical professional providing the services. The provider further certifies, expressly and impliedly when submitting the CMS 1500 requesting payment, that the information provided is truthful.

22.     It is unlawful for any person, organization, agency, or entity to present a claim for payment under Medicare for a pattern of medical services that are not medically necessary. 42 U.S.C. § 1320a-7a(a)(1)(E).

### C.     Medicare Regulations And Guidelines Regarding Inpatient Psychiatric Hospital Services

23.     CMS provides for a per diem-based prospective payment system for inpatient hospital services of inpatient psychiatric facilities. 42 C.F.R. § 412.400(a). Inpatient psychiatric facilities are certified under Medicare as inpatient psychiatric hospitals and distinct psychiatric units of acute care hospitals. Medicare Benefit Policy Manual Chapter 2 – Inpatient Psychiatric Hospital Services § 10.1.

24.     Payment for inpatient psychiatric hospital services is only for "active treatment" that can reasonably be expected to improve the patients' condition or for the purpose of diagnosis. Medicare Benefit Policy Manual Chapter 2 –

Inpatient Psychiatric Hospital Services §§ 30.2.2; 30.2.2.1. To assure that payment is made only under these circumstances, the law requires that the services furnished are medically necessary and are certified as such. *Id.*

25. With respect to inpatient psychiatric hospital services, a physician must provide a certification that includes a statement that the services furnished can reasonably be expected to improve the patient's condition or are for diagnostic study. *Id.* at § 30.2.1.1.

26. A physician must recertify as of the 12th day of a psychiatric hospital patient's hospitalization that the services were and continue to be required for treatment that could reasonably be expected to improve the patient's condition or for diagnostic study. *Id.* at § 30.2.1.2. Further, the recertification must state that the patient continues to need, on a daily basis, active treatment furnished by inpatient psychiatric hospital personnel. *Id.*

27. In addition to the 12-day recertification, hospital records should show that the services furnished were intensive treatment services, admission or related services, or equivalent services. *Id.*

D.  **Medicare Discharge Planning Process**

28. As a condition of participation in Medicare, a hospital must have in effect a discharge planning process that applies to all patients and that avoids unnecessary delays in discharge. 42. C.F.R. § 482.43(a)(5). This condition applies to psychiatric hospitals. 42 C.F.R. § 482.60(b).

29. It is unlawful for any person, organization, agency, or entity to give any information with respect to inpatient hospital coverage under Medicare that

is false or misleading, or that could reasonably be expected to influence the decision when to discharge an individual from the hospital. 42 U.S.C. § 1320a-7a(a)(3).

## THE FACTS

**Background On Inpatient Psychiatric Hospital Treatment And Discharge At NPHI**

30. When a patient is admitted to NPHI, an interdisciplinary team of hospital personnel develops a Master Treatment Plan ("MTP") for that patient. This MTP is intended to set realistic and measurable goals to guide the treatment process.

31. Hospital personnel track the patient's progress in Daily Progress Notes ("DPNs"). Medical staff update the DPNs to show whether there are improvements in current diagnoses and symptoms to reflect whether or not the patient is meeting the goals set forth in the MTP.

32. When the patient meets the goals set forth in the MTP and has improved symptoms related to their diagnosis for approximately two to three days, the patient is ready for discharge from the inpatient setting.

33. Hospital personnel meet twice a week at "Interdisciplinary Rounds" ("IDR") to review MTPs and DPNs, track whether patients are meeting their MTP goals, and set discharge dates. After coming to a consensus on a patient being ready for discharge, the treating psychiatrist drafts and executes the discharge order.

34. Relator Glass was actively involved in the IDRs. Relator Glass was largely responsible for patients' discharge plans, and would draft discharge orders for physicians' approval.

35. Generally, a psychiatric hospital patient is ready for discharge two to three days after no further symptoms are noted, by which time the patient is stabilized on medications and ready for follow-up treatment on an outpatient basis.

36. In the summer of 2015, NPHI began operations with 30 test patients. After a CMS audit, NPHI qualified for participation in Medicare, and officially opened to the public in September 2015.

**NPHI Enacts 14-Day Patient Holding Policy**

37. Approximately two weeks after accepting Medicare coverage, Cameron Gilbert met with NPHI's treatment team to discuss patients' length of stay before discharge.

38. At this meeting, Gilbert told the team that patients need to be held for 14 days or longer, regardless of when patients are actually ready for discharge. Gilbert stated to the team, "14 days is the money maker." Gilbert also commented on the "sweet spot being 14 days or after, but before 17 days."

39. Gilbert further informed the team that all NPHI personnel, including psychiatrists, psychologists, nurse practitioners and social workers, had to get approval from him or Dr. Posar before discharging a patient.

40. Dr. Posar indicated to Relator Glass, and Gilbert indicated to the team at the meeting, that the CMS audit recommended the 14-day length of stay.

When Relator Glass spoke with NPHI management regarding the audit, NPHI management revealed that there was nothing in CMS's audit regarding any 14-day length of stay, or anything related to length of stay at all.

41. On information and belief, the 14-day patient holding policy is in effect at all other NeuroPsychiatric Hospital locations.

**NPHI Enforces 14-Day Patient Holding Policy**

42. If a patient has been in NPHI for less than 14 days, Gilbert or Posar will deny the request to discharge the patient. Gilbert and Posar have given approval to discharge a patient prior to the full 14-day period only when the patient's family complained, or the patient's insurance would not cover the additional days.

43. If NPHI personnel discharge a patient before the full 14-day period has run, they face intense questioning from Gilbert, Posar, or NPHI management. Several personnel have been threatened by NPHI management, and two or three employees at NPHI have been fired for their non-compliance with NPHI's 14-day patient holding policy.

44. Due to NPHI's rigorous enforcement of its 14-day patient holding policy, the treatment team in the IDR would schedule patients' discharge dates for 14 days after the patients' admission, regardless of patients' appropriate discharge date.

### Relator Glass Is Disciplined For Violating The 14-Day Patient Holding Policy

45. In November 2015, a female patient was admitted to NPHI for depression and suicidal ideation. The patient had suffered a sexual assault one month prior to her admission.

46. Although the patient's depression improved, she suffered increased anxiety throughout her stay at NPHI due to the presence of several young male patients, who behaved aggressively towards her. The patient grew fearful of her safety in the presence of these aggressive male patients.

47. Relator Glass and the patient's treating psychiatrist both agreed that the patient was ready to be discharged, even though 14 days had not passed since the patient's admission into NPHI.

48. Relator Glass and the patient's treating psychiatrist drafted and executed the discharge order for the patient. The patient was discharged eight days after she had been admitted as an inpatient at NPHI.

49. After the patient was discharged, a social worker informed Relator Glass that "everyone was upset" about the patient's "early" discharge.

50. Several days thereafter, the Vice President of Operations for NPHI called Relator Glass into the Vice President's office. The Vice President questioned Relator Glass about why the female patient had been discharged only eight days after her admission, and told Relator Glass that Gilbert and Posar were upset about the discharge.

51. The Vice President of Operations subsequently imposed a temporary suspension on Relator Glass.

52. According to the Vice President of Operations, NPHI placed Relator Glass in a temporary suspension while NPHI investigated whether Relator Glass had practiced medicine without a physician's knowledge. As a nurse practitioner, however, Relator Glass is able to practice independently of a physician.

53. NPHI's suspension of Relator Glass was retaliation for Relator Glass's involvement in discharging the female patient before the full 14-day period had accrued.

**NPHI Holds Medicare Beneficiaries Past Their Appropriate Discharge Date**

54. Medicare beneficiaries held past their appropriate discharge date pursuant to NPHI's 14-day patient holding policy include the following patients:

    a. Lorain P. Ms. P. was admitted as an inpatient at NPHI on September 28, 2015.

    b. Karl H. Mr. H. was admitted as an inpatient at NPHI on October 5, 2015.

    c. Petrona M. Ms. M. was admitted as an inpatient at NPHI on October 6, 2015.

    d. Janice W. Ms. W. was admitted as an inpatient at NPHI on October 8, 2015.

    e. Joyce F. Ms. F. was admitted as an inpatient at NPHI on October 12, 2015.

    f. Patricia E. Ms. E. was admitted as an inpatient at NPHI on October 13, 2015.

    g. Jaon K. Mr. K. was admitted as an inpatient at NPHI on October 14, 2015.

    h. Gloria S. Ms. S. was admitted as an inpatient at NPHI on October 15, 2015.

      i.      Marjorie C. Ms. C. was admitted as an inpatient at NPHI on October 22, 2015.

      j.      Georgia W. Ms. W. was admitted as an inpatient at NPHI in December, 2015.

      k.      Barbara H. Ms. H. was admitted as an inpatient at NPHI in December, 2015.

**NPHI's 14-Day Patient Holding Policy
Results In The Submission Of False Claims**

55.  NPHI management directed NPHI personnel to manipulate patients' DPNs so as to justify the patients' staying at NPHI for the full 14-day period, even though patients were ready for discharge before 14 days.

56.  Dr. Dennis Padla, a physician at NPHI, told Relator Glass to document reasons for patients to stay beyond their appropriate discharge date. Dr. Padla stated that Relator Glass should "grasp at straws" to justify the patients' delayed discharge.

57.  Relator Glass would record in patients' DPNs the appropriate date on which the patient was ready for discharge.

58.  NPHI management asked Relator Glass to change hospital documentation, including changing orders for patients that were no longer at NPHI.

59.  For many days of patients' stay at NPHI, the patients' DPNs show no activity, despite Medicare's requirement that hospital records must show that the reimbursed services furnished were intensive treatment services, admission or related services, or equivalent services. See 42 U.S.C. § 1395f(a)(4); Medicare

Benefit Policy Manual Chapter 2 – Inpatient Psychiatric Hospital Services § 30.2.1.2.

60.  Services provided by NPHI pursuant to its 14-day patient holding policy are not reasonably expected to improve the patient's condition or for the purpose of diagnosis, and are not medically necessary.

61.  Relator Glass would submit charges for patients' stay at NPHI to Vanguard. Vanguard would then approve the charges for billing.

62.  NPHI had Relator Glass bill under a physician's billing account.

63.  The bills had an option for indicating whether a physician was present for the services billed. Whether or not a physician was present affects the reimbursement rate.

64.  On information and belief, Vanguard selected the option on the bill that indicated a physician was present, even though at all relevant times NPHI did not have a resident physician.

**Relator Glass Voluntary  
Discloses Information To The Government**

65.  In January 2016, Relator Glass called the Medicare and Medicaid fraud hot line listed on the United States Attorney General's website to report NPHI's submission of false claims.

66.  Thereafter, Relator Glass spoke with a Special Agent with the Department of Health & Human Services Office of Inspector General and a Deputy Attorney General for the State of Indiana, and arranged to meet with them regarding NPHI's 14-day patient holding policy.

67. Relator Glass met with the Special Agent for the OIG and the Deputy Attorney General for Indiana twice, in January and February 2016, and described substantially the entire contents of the facts alleged herein.

68. The Deputy Attorney General had opened an investigation into possible Medicare fraud at NPHI, but was unaware of NPHI's 14-day patient holding policy until Relator Glass disclosed the policy to the Deputy Attorney General.

## COUNT I
## FEDERAL FALSE CLAIMS ACT – PRESENTATION OF FALSE CLAIMS
## (31 U.S.C. § 3729(a)(1)(A))

69. Relator Glass re-alleges the preceding paragraphs as if set forth herein.

70. By virtue of the acts and omissions described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1).

71. Said false and fraudulent claims were presented with Defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

72. The United States relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid Defendants for these false and fraudulent claims had it known the falsity of said Medicare claims by Defendants.

73. The acts and omissions described above were material to approval, audit and monitoring, and payment of said claims and other actions by the United States.

74. As a direct and proximate result of the false and fraudulent claims made by the Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the FCA.

## COUNT II
## FEDERAL FALSE CLAIMS ACT - FALSE RECORDS AND STATEMENTS
## (31 U.S.C. § 3729(a)(1)(B))

75. Relator Glass re-alleges the preceding paragraphs as if set forth herein.

76. By virtue of the acts and omissions described above, Defendants knowingly agreed to make use of, and did indeed make use of, or cause to be made use of, false records or statements to get false or fraudulent claims paid or approved by the Government, in violation of 31 U.S.C. § 3729(a)(1)(B).

77. Said false records and statements were presented with Defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether they were false.

78. The United States relied on these false and fraudulent records and statements, was ignorant of the truth regarding these records and statements and would not have paid Defendants for the fraudulent claims supported by these false records and statements had it known the falsity of said records and statements.

79. The acts and omissions described above were material to the approval, audit and monitoring, and payment of the false and fraudulent claims.

80. As a direct and proximate result of the false and fraudulent claims made by the Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the FCA.

81. The acts and omissions described above were material to contract approvals, audit and monitoring approval, payment of said claims and other actions by the United States.

82. The acts and omissions described above caused damages to the United States, in substantial amounts to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff-Relator Jaci Glass, on behalf of herself and the United States Government, prays that:

1. This Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained, plus a civil penalty of $11,000 for each false claim made in violation of 31 U.S.C. § 3729;

2. The Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act;

3. The Relator be awarded all reasonable attorneys' fees, costs, and expenses;

4. The Court award pre-judgment and post-judgment interest;

5. The United States and the Relators receive all other relief, both at law and in equity, to which they are entitled.

## JURY DEMAND

Relator, on behalf of herself and the United States Government, demands a jury trial on all issues so triable.

DATED: March 11, 2016

                                              Respectfully submitted,

                                              JACI GLASS

By: _/s/ Bruce C. Howard_
One of the Attorneys for Relator
and Plaintiffs

Bruce C. Howard
*bhoward@siprut.com*
Richard S. Wilson
*rwilson@siprut.com*
**SIPRUT PC**
17 North State Street
Suite 1600
Chicago, Illinois 60602
312.236.0000
Fax: 312.878.1342